(C. D. 1605)

HAROLD A. SOTHERN *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 8, 1954)

*Michael Stramiello, Jr.*, for the plaintiff.

*Warren E. Burger*, Assistant Attorney General (*Arthur R. Martoccia*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: There is involved in this case the question of the proper classification of certain paperboard imported from Guatemala. This merchandise, which was described on the consular invoice as "80,814 lbs. strawboard cal. .016," was classified by the collector of customs at the port of New York as test or container boards of a bursting strength above 60 pounds per square inch by the Mullen or Webb test, and accordingly assessed with duty at the rate of 10 per centum ad valorem, pursuant to the provisions of paragraph 1413 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802. It is the claim of the plaintiff herein that the involved merchandise is strawboard, which is provided for in paragraph 1402 of said act, as modified by said trade agreement, and should properly have been subjected to an assessment of duty at the rate of 5 per centum ad valorem.

The pertinent provisions of the Tariff Act of 1930, as modified, read as follows:

Paragraph 1402:

Pulpboard, strawboard, and leather board or compress leather, not plate finished, supercalendered or friction calendered, laminated by means of an adhesive substance, coated, surface stained or dyed, lined or vat lined, embossed, printed, decorated or ornamented in any manner, nor cut into shapes for boxes or other articles and not specially provided for:

Pulpboard in rolls for use in the manufacture of wallboard, and strawboard_____ 5% ad val.

Paragraph 1413:

Test or container boards of a bursting strength above sixty pounds per square inch by the Mullen or the Webb test_____ 10% ad val.

It appears from the record that the subject merchandise was imported in 26 rolls, of a diameter of 48 to 50 inches, a width of approximately 60 to 61 inches, and a weight of about 3,000 pounds. As evidenced by the testimony of plaintiff, Harold A. Sothern, who had, on about one dozen occasions, actually seen paperboard of the same type produced in Guatemala, by the manufacturer of the instant importation, the merchandise at bar was made in the following manner:

This entails essential oil grasses that are brought into a mill in the form of straw. These grasses are cut, allowed to dry to a certain degree in the fields, brought to the mill, put through a cutting machine which chops it up into small pieces. Then they are conveyed to a rotary digestor where chemicals are added and it goes through a pulping operation. From there it is transferred to a beater or a type of hydro-pulper, where a further treatment takes place. From there it goes to a Jordan.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

A Jordan is a cone-shaped piece of equipment whereby the pulp material is fed into it and it revolves with certain sharp blades on the inside that further cuts the material and prepares it to a finer consistency of pulp so that it can be run on the regular paper machine.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

From there it goes into a stock chest where it is pumped up to a cylinder. This is a rotary cylinder that has a wire screen to it, a screen similar to the so-called Fourdrinier method. From the cylinder that forms the original basic wet sheet of board it is then carried through various press rollers and then on through many driers where it is dried and comes out on the other end as strawboard.

Plaintiff testified further that he is engaged in the business of importing various essential oils, spices, paper, "this paper board," strawboard. Approximately 6 or 8 months after the actual importation of this merchandise, and while the same was in the warehouse, he took quite a number of samples from the imported rolls. Two of these samples were produced and received in evidence as plaintiff's collective exhibit 1; two as defendant's collective exhibit A; and two as defendant's collective exhibit B. After keeping his samples exposed on a table in his office, which is steam heated and subject to varying temperature changes, for a period of about 8 months longer, or until about 3 or 4 weeks before the trial, plaintiff took them to the office

of a paper dealer and there put them through a Mullen test, under ordinary room conditions. This test, according to plaintiff, determines the burst factor in board and registers the number of pounds per square inch of pressure required to burst through the board. It indicates the strength of the board from the standpoint of its ability to withstand weight pressure and is one of the bases used by the trade to determine the quality of the board. Each of the sheets of plaintiff's collective exhibit 1 burst, once at 49 pounds, and again at 51 pounds, when tested by plaintiff.

Plaintiff further stated that strawboard is a board made from straw that is chemically treated into a pulpous state and is then put through a regular paper or boardmaking process; that in the past 3 years he has handled approximately 600 to 700 tons of this merchandise, which was made principally from citronella and lemon grasses; that prior thereto it was not known in the American market; and that it is strawboard which had not been further processed.

According to plaintiff, strawboard is used, depending upon the caliper or thickness of the board, as a corrugating medium. For this purpose, a thickness of 9/1000 of an inch is customarily used. Higher calipers are laminated into three or four layers and used for backing, siding, and partitions. He stated that he had seen strawboard produced in the State of Michigan from wheat straw, which was put through a rotary digester similar to the one used in Guatemala, chemically treated, usually with lime, as in the case of the instant merchandise, and otherwise processed in substantially the same manner. Plaintiff admitted, however, that he had never bought or sold any strawboard made in the United States.

When asked to define container board, plaintiff stated that it is "a board that could be used for making containers, principally shipping containers, that would conform to certain specifications and certain desires on the part of the buying trade; that the board was sufficiently strong to stand up in the making of containers." It could be made of various types of material, including waste paper, kraft clippings, sulphate pulp, crude kraft, or wet lap kraft.

Plaintiff was of opinion that the board which surrounds the corrugating medium in a paper box is liner board which differs from container board in that it is of a thinner caliper. He described test board as a "board that must conform to certain definite specifications as adopted by the trade. Those specifications pertain to burst, to tear, to bending qualities, color, scoring properties, et cetera." It is used as a corrugating medium, as a corrugation, as a liner, for folding boxes, and for many other purposes. He distinguished among test board, container board, liner, and strawboard, as varying in specifications, but, nevertheless, as having parallel usage in that they are used for making containers and as corrugating media.

Plaintiff stated further that he had difficulty in finding a market for this commodity, but that he finally disposed of it at a wastepaper price, a price far below the market for strawboard. When asked by the court whether the importation would be a good delivery for strawboard, plaintiff answered:

It would hardly be called a strawboard comparable to the strawboard made, for example, in Michigan from wheat straw. It approaches it. And that was the purpose of this manufacture in Guatemala, to try to approach in quality specifications the so-called known strawboard on the market.

Elwood Kauffman, the second witness called by plaintiff, is presently vice president in charge of containers of the firm of William F. Fitzhugh, Inc., and had occupied that office for 5 years prior to the date of trial. His total experience in dealing with test or container board dates back to 1928, and includes a period of 14 years with Fibreboard Products Co., Federal Container Division, who manufactured container board, test board, and strawboard.

This witness testified that his company manufactures corrugated shipping containers, folding boxes, setup boxes, and envelopes, and that it purchases test or container board for conversion into sheets which are further converted into corrugated containers. He defined test board as a variety of container board that has bending qualities susceptible of scoring or indenting with a bar or rotary crease and a bursting strength measured in pounds per square inch in conformity with its particular caliper; container board as a similar board which does not have to meet all of the requirements outlined for test board. He then stated that container board, which includes test board, is manufactured from wood pulp of various types, sulphates, or wastepaper.

In the opinion of this witness, whether a board is test or container board is determined, not by its composition or use, but by its bending quality or test. It must have sufficient strength to accomplish a purpose. If, for example, a 125-pound test container were desired, the board would have to test 65 pounds for a single liner, since two are used.

Kauffman further testified that test board is also used to manufacture products not requiring test as such, as, for example, mailing and folding containers; and that the tests or specifications for test board are prescribed by rule 41 of the Consolidated Freight Classification Code, a code set up by the railroads to insure greater safety for transportation purposes, and as a protection against damage claims.

This witness had purchased some strawboard which was used for flat pads or built-up pieces of fiber that did not require scoring in any way. He stated that Mr. Sothern, the plaintiff, had offered to sell him merchandise such as represented by plaintiff's collective exhibit 1, but that he refused to purchase it because it did not meet the bending

or Mullen test of his company. It was his opinion that that board was not suitable for manufacturing test or shipping containers, but, even if it tested 60 pounds, he would not have been interested in the product because his company required a 100-pound test board. He had purchased from plaintiff strawboard of a thickness of 9/1000 of an inch which was used by his company for a corrugating medium between liners. He expressed the opinion that merchandise of the kind represented by plaintiff's collective exhibit 1 could be used as a corrugating medium, but that it would be impractical to do so because the process would be slower, the cost greater.

When asked whether board produced, as was the instant merchandise, from dried grass, and testing 49 to 51 pounds by the Mullen test, is test or container board, testing above 60 pounds per square inch, Kauffman answered that it could not be test or container board because test board used by his company has a test of 100 pounds. Moreover, plaintiff's collective exhibit 1 has no bending quality. It cracks. He could tell from the odor that it was board made from citronella grass and stated: "I wouldn't want to put a name on it, frankly. I would outlaw it immediately as useful in my own particular case." He would call it strawboard if dried grass is considered straw, and he believed dried grass to be straw. Although admitting that strawboard is generally made from wheat straw, Kauffman stated that, to the best of his knowledge, plaintiff's collective exhibit 1 is strawboard.

This witness was of opinion that the instant board would not be recognized in the trade as test or container board; that at this weight it has no commercial purpose in the industry. He stated:

I would say that this is a nice beginning, a good start in the direction of making test board, but they just haven't gotten the quality here. If this fellow manufacturing this item had kept this down to nine-point in caliper and sold it as a corrugated medium, he'd have done a lot better with the thing. As a matter of fact, when I was approached by Mr. Sothern sometime back on this thing I told him I thought he was very foolish to put this in this kind of board.

In reference to the Mullen test, Kauffman testified that the degree of humidity in a board will vary the results; that steam heat will add moisture to a board; and that, therefore, it would burst at a lower level.

The first witness called to testify for the defendant was Edwin T. Walton, examiner of merchandise at the port of New York for 14 years, who has been in the paper division since 1945. He was the examiner who passed the imported merchandise and described it as "Test or container boards of a bursting strength above 60 pounds per sq. inch by the Mullen or the Webb test." He stated that he tested approximately 1 pound of the total importation within 10 days after entry, the samples having been taken by the official sampler;

and although he could not recall this entry specifically, if there had been a closeness to the 60-pound line, he would have submitted the samples to a laboratory for further, more accurate analysis.

On the day before the trial, Examiner Walton subjected defendant's collective exhibit A to a Mullen test. Sheet number 1 of that exhibit tested twice at 58 pounds, twice at 64 pounds; sheet number two punctured at 63 and 68 pounds. In reporting these results, the witness stated that all paperboard varies in thickness and strength, because in the process of manufacture the fibers are not distributed uniformly and they vary in flowing through the boardmaking machine; and where there are variations above and below, the 60-pound mark per sheet an average is taken.

Examiner Walton produced a Mullen-testing machine, the official machine used in the appraiser's stores, concerning which he stated that the machine had not been tested since his acquaintance with it. In open court, he subjected plaintiff's collective exhibit 1 and defendant's collective exhibit A to the Mullen test with the following results: Sheet 2 of exhibit A tested a fraction over 64 pounds and on the reverse side 56 plus pounds; sheet 1, 66 and 62 pounds; sheet 1 of exhibit 1 tested 52 and 65 pounds; sheet 2, 54 and 61 pounds.

This witness admitted that these tests are not accurate, but stated that they are guiding and that he had always made them that way.

John W. Moore, testifying in behalf of defendant, stated that he is assistant sales manager in board and board sales of International Paper Co. and has been with that company for 25 years; that he is familiar with the manufacture of paperboard and has sold it throughout the United States; that on an annual basis he has sold about 1,600,000 tons of container board within the last year. This witness defined container board as any board that is used in making a shipping container or corrugated box, which will serve the purpose for which it was originally intended; test board as a type of container board. He stated that the end use of a board rather than its component material determines whether it is container board; and that strawboard is chiefly used as a corrugating medium, and is made from wheat straw.

Moore examined the exhibits and, after tearing one, described the instant material as a very poor grade of jute liner—a product which is called by that name even though not made from jute—which is a container board and not a strawboard. He testified further that container board must have bursting strength, must be a good bender and have proper finish, and must "live up to the requirements of the classification committee," which is under the jurisdiction of the Interstate Commerce Commission.

This witness considered the merchandise to be a poor bender, which, however, could be used in a box as a liner. He testified that this merchandise is a jute liner container board and, given the results of

the test on defendant's exhibit A, taken the day before the trial, stated that it is test board.

Witness Moore further stated that most plants have controlled humidity rooms for testing paperboard; that humidity affects the actual test; that if a board becomes dried out it would test less than if the humidity were controlled; that moisture increases the bursting strength; that age makes it test less; and that you will find variations in the testing of a board. He reaffirmed that this merchandise is not strawboard but averred that even if it were it would still be container board. Nevertheless, he admitted that dried grass could be used in making strawboard, and that there are so-called strawboards made without straw.

Counsel for plaintiff read to this witness the following definitions of strawboard and jute liner taken from the "Dictionary of Paper," as published by the American Paper & Pulp Association, a recognized authority in this field:

[Strawboard]

Strawboard is made from straw which is treated chemically and then passed through the customary paper-making process.

[Jute Liner]

A paper board used chiefly as an outer facing in the manufacture of corrugated or solid fiber shipping containers.

\* \* \* \* \* \* \*

It is made of wood pulp and waste papers on cylinder machines with the outer plies of kraft pulp or old kraft papers.

\* \* \* \* \* \* \*

It is commonly 0.010 to 0.030 of an inch in thickness and weighs from 33 to 110 pounds per thousand square feet.

\* \* \* \* \* \* \*

It is water resistant and has good bending qualities.

\* \* \* \* \* \*

The board is resistant to abuse and has a finish adapted to printing with metal or rubber type.

He agreed with the definition of strawboard, but disagreed with the definition of jute liner for the reasons that it could also be an inner facing; it can be made without any pulp at all; and is determined by weight, not caliper.

At the conclusion of the testimony of this witness, there occurred the following:

By Judge Lawrence:

\* \* \* \* \* \* \*

Q. Based upon your long experience and knowledge in the trade, and based upon such examination as you have been able to make of the exhibits before you, is it your considered opinion without further and more elaborate tests that those exhibits represent a product which would meet the requirements of the Interstate Commerce Commission and the freight transportation regulations as test board or

container board?—A. I don't believe that particular sheet, your Honor, would meet the test.

Q. I wanted to know your honest opinion based upon your wide commercial experience.—A. And, if I may answer, in trade practices it's a type of sheet that could only be used under probably a very heavy demand period.

Q. Sort of under stress conditions?—A. Yes.

The last witness for defendant was John H. MacLeod, a special representative for the Robert Gair Co., which manufactures cartons and shipping boxes. His experience in the paper business dates back to 1914, with time out for military service in the First World War and a period of 7 years thereafter when he was otherwise affiliated. This experience included a 24-year association with the Hinde & Dauch Paper Co., a concern handling corrugated and solid fiber shipping containers, as well as a short period of service as a consultant for the containers division of the National Production Authority.

MacLeod testified that test board is a container board used in the manufacture of corrugated and solid fiber shipping containers; that container boards are those grades of paperboard used in the manufacture of corrugated and solid fiber shipping containers; that he is familiar with the Mullen test; that storage of paperboard tends to dry it, and, when dry, it becomes stiff, resulting in a lower bursting test; that controlled testing calls for from 55° to 60° relative humidity; and that bursting strength is an important factor in determining the adaptability of paperboards for their intended use.

This witness further stated that he has handled large quantities of strawboard and has seen it manufactured. In his opinion, strawboard is a container board made from cereal straw, preferably wheat straw. He also testified that he saw merchandise the same as the exhibits before the court, imported from Guatemala and having a bursting strength of 65 pounds by the Mullen test, used as a container board; that, in his opinion, this merchandise is container board; that it is not strawboard, since it is made from citronella pulp; that, however, if it were made from straw it would be strawboard; that he has seen strawboard made from wheat straw, oat straw, barley straw, rye and rice straw, but not from grass; that in his 35 years' experience he had never seen or known of strawboard being made from other material than straw; that jute liner is made from old corrugated boxes and kraft pulp; kraft liner board from virgin kraft pulp; that container board, the characteristics of which are caliper and test, could be made from grass; that wheat straw is used to make strawboard because of the tubular formation of the straw itself, which has a high percentage of lignite, the fibrous content that goes into the making of the sheet; and that one of the companies with which he was associated tried to make strawboard from hay, but was not successful.

It may be seen from the foregoing extensive review of the testimony that this case is not without its complexities and that the proper classification of the instant merchandise is not susceptible of easy solution. Four witnesses, with extensive backgrounds in the paperboard field, who had handled vast quantities of different kinds of paperboard, experienced difficulty in assigning to the merchandise at bar a categorical description as either test or container board on the one hand, or strawboard on the other. Unequivocal assertions on the part of witnesses for the plaintiff that the imported commodity is strawboard were modified by acknowledgment of its inferior quality, and the fact that its component material differed from that of the strawboard of commerce. Positive identification of the merchandise by defendant's witnesses as test or container board was qualified by frank admissions that this material would not meet the commercial tests for container board. Nevertheless, running all through the testimony is the implied concession that, if dried citronella grass is straw, the merchandise at bar is strawboard.

The parties have not relied upon any designations peculiar to the trade and commerce of the United States which would ascribe to the tariff terms here under consideration a meaning at variance with that which obtains in common parlance. Accordingly, it must be presumed that these meanings are the same, and the language of the statute must be given that construction which reflects its common meaning. *Nix* v. *Hedden*, 149 U. S. 304; *Maddock* v. *Magone*, 152 U. S. 368; *Hartmann Trunk Co.* v. *United States*, 27 C. C. P. A. (Customs) 254, C. A. D. 95. Guided by such extrinsic aids as may refresh its mind and memory, the duty of ascertaining and establishing such meaning devolves upon the court. *United States* v. *O. Brager-Larsen*, 36 C. C. P. A. (Customs) 1, C. A. D. 388; *United States* v. *Florea & Co., Inc.*, 25 C. C. P. A. (Customs) 292, T. D. 49396; *United States* v. *John B. Stetson*, 21 C. C. P. A. (Customs) 3, T. D. 46319. The court may also consider the testimony of expert witnesses whose experience with particular articles of commerce qualify them to express opinions as to the nature, character, and designations of such articles. This testimony is advisory only, and without binding effect. *Stephen Rug Mills* v. *United States*, 32 C. C. P. A. (Customs) 110, C. A. D. 293; *Absorbo Beer Pad Co., Inc.* v. *United States*, 30 C. C. P. A. (Customs) 24, C. A. D. 209.

In support of his contention that the merchandise at bar falls within the common meaning of the tariff term "strawboard," plaintiff in his brief has invited our attention to several definitions of "straw" and "strawboard," from which we quote the following:

From Webster's New International Dictionary, 1933 Edition:

Straw: 1. A stalk or stem of grain as of wheat, rye, oats, barley or Indian corn; also a stalk of buckwheat, beans or peas.

From Funk & Wagnalls New Standard Dictionary, 1941 Edition:

> Straw: 1. A stalk, stem or piece of a stalk or stem, of various grains, especially wheat, rye, oats, barley and buckwheat, less frequently of peas and beans; applied generally to a dry or ripened stalk.

\*     \*     \*     \*     \*     \*     \*

From the Illustrated Dictionary of Gardening, A Practical Scientific Encyclopedia of Horticulture for Gardeners and Botanists, Edited by George Nicholson ALS Vol. III:

> Straw: A term applied to the above-ground stems of *grasses*.

From The Dictionary of Paper, published by the American Paper and Pulp Association of New York, N. Y. 1940 Edition:

> Strawboard.—(1) A paperboard used for setup boxes, tablet backs, etc. It is a rigid board but not susceptible to high finish and for the setup box trade is usually lined with paper. (2) A paperboard used for mailing tubes and cans. The board is made about 0.020 of an inch in thickness for spiral winding and is resistant to crushing. (3) Corrugating material in the manufacture of shipping containers. The strawboard is 0.009 of an inch in thickness and is readily formed into flutes in the corrugating process. When it is pasted with a liner on one or both sides, it is rigid and resilient after compression. *Strawboard is made from straw which is treated chemically and then passed through the customary papermaking process.* \* \* \*

\*     \*     \*     \*     \*     \*     \*

From Trade Agreement Digests, Volume XIV, published by the United States Tariff Commission, November 1946, page 7:

> Strawboard is a coarse board made of pulp produced by the chemical and mechanical treatment of straw from wheat, rye, barley, oats, *or other plants.* It is rigid, hard, usually yellow or brown in color, can be made on any type of paper machine, and will not take a high finish. It may range in thickness from 6 to 90 one-thousandths of one inch, the thicker boards often being lined with book or other paper before final use. [Italics quoted.]

Especially in view of the admission of defendant's witness, Moore, that dried grass could be used in making strawboard, and that there are so-called strawboards which are made without straw, it would be taking an extremely narrow interpretation of the cited definitions to hold that strawboard is such paperboard only whose principal ingredient is dried cereal grass. It places no undue strain upon these definitions to adopt the more comprehensive view that dried stalks of grasses other than grains are likewise generally, commonly, and popularly known as straw, and that paperboard made from nongrain grasses, which have been dried and chemically treated, is strawboard. Since the evidence in this case clearly shows that the merchandise at bar was made from dried stalks of citronella and lemon grass, chemically treated and processed, we have no hesitation in holding that it is strawboard within the common understanding of that term.

Ordinarily, this would suffice to dispose of the matter before us, were it not for the contention of defendant that the provision for test or container boards is a designation by use which must prevail over

the *eo nomine* provision for strawboard, and, hence, that even if this paperboard is strawboard, it is also test or container board. The principle invoked by the defendant is a well-recognized rule of statutory construction often resorted to where the intent of the legislature is not otherwise manifested. *United States* v. *Snow's United States Sample Express Co.*, 8 Ct. Cust. Appls. 351, T. D. 37611; *Julius Forstmann & Co.* v. *United States*, 28 C. C. P. A. (Customs) 222, C. A. D. 149. It is, however, by no means clear, either from the language employed by Congress in paragraph 1413, *supra*, or from the record in this case, that what we are here concerned with is a simple use designation.

The provision in question is for "Test or container boards of a bursting strength above sixty pounds per square inch by the Mullen or the Webb test." Before an inquiry into the method of use may be pursued, it must first be established that the subject merchandise is that kind of paperboard which responds to the definition of test or container board, and that it has a bursting strength above 60 pounds per square inch when tested, as prescribed by Congress.

The weight of the evidence in this case establishes that in two significant respects the involved paperboard does not meet the specifications for test or container board. It is neither "a good bender," nor has it been made from materials which are usually employed in the production of test or container boards. What has been imported here is an inferior product which defendant's witness Moore frankly and honestly admitted would not meet commercial specifications for test or container board.

Moreover, we are of opinion that the proven results of the Mullen tests reveal that the instant board lacks that minimum degree of bursting strength which Congress has decreed shall characterize the test or container boards provided for in said paragraph 1413. In each instance that plaintiff tested the merchandise, it burst before a pressure of 60 pounds was applied. In the case of the Government's testing, at the trial, even if an average were struck, it does not appear that this board had a bursting strength *above* 60 pounds per square inch. Neither is there evidence in this record to support the examiner's action in striking an average bursting strength where portions of a sample test above or below the statutory requirement. If such be the practice commercially or as countenanced by long-continued administrative action, we are not so advised. Without some overt expression of authority to sanction this practice, we do not construe the statutory language as authorizing it.

While the merchandise at bar might, under stress conditions, be employed in the manufacture of containers, we are of the opinion that it is not test or container board as provided by the Congress.

In view of the foregoing, we hold that the merchandise here involved is strawboard within the provisions of paragraph 1402, as modified, *supra*, and that the proper rate of duty assessable thereon is 5 per centum ad valorem. The claim of the plaintiff to that effect is sustained.

Judgment will be entered accordingly.