(C. D. 1856)

W. R. GRACE & Co.
HOWARD HARTRY } v. UNITED STATES

United States Customs Court, Second Division

(Decided March 12, 1957)

*John D. Rode* for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Mollie Strum* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: This action involves a consideration of two protests, consolidated for the purposes of trial, wherein is raised the question of the proper dutiable status of several importations of paper from Peru. This merchandise was classified by the collector of customs at the port of Los Angeles as paper, not specially provided for, within the provisions of paragraph 1409 of the Tariff Act of 1930, and, accordingly, was assessed with duty at the rate of 30 per centum ad valorem.

It is the claim of plaintiffs herein that said paper is strawboard or straw paper, which is dutiable at the rate of 7½ per centum ad valorem, pursuant to the provisions of said paragraph 1409, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

Certain facts with respect to the issue here to be determined are not disputed. They are that the paper in question measures 0.009 inch in thickness, which, being less than 0.012 inch in thickness, is to be considered paper, rather than board, under the language of the proviso to paragraph 1402 of said act, although throughout the trial of this action these two terms were used interchangeably; and that said paper has, as its principal ingredient, shredded stalks of sugarcane from which sugar juices have been extracted, which material is known as bagasse.

It also appears, without controversion, that, in the production of this paper, bagasse is "chemically digested in a spherical rotary digester with a chemical alkali and after that cooking operation, it is washed and beaten in normal paper operations," resulting in the product at bar.

At the trial, each of the parties called one witness. In addition, certain physical exhibits were introduced into evidence. For the plaintiffs, the witness was Thomas M. Cook, vice president in the general engineering department of W. R. Grace & Co., the ultimate consignee, whose duties principally are concerned with the pulp and paper operations of that company.

Cook testified that he holds a bachelor of science degree from the New York State College of Forestry and is a member of several technical associations in the paper and forest products industries. He also served on the Bagasse and Finance Committee at the United Nations Conference in Buenos Aires in the fall of 1954. Before becoming associated with W. R. Grace & Co., he was first a shift chemist; then, chief chemist for the Racquette River Paper Co. of Potsdam, N. Y. He left that organization some 17 years ago for employment with W. R. Grace & Co., initially to proceed to Peru to participate in the company's bagasse pulp and paper operations there. Since then, along with other engineering duties, he has been directly concerned with the development of his company's pulp and paper projects. In connection therewith, he has traveled extensively in the United States, particularly in the South and west coast areas, as well as through various countries in South America, and to Sweden, France, and Canada, but did no selling.

This witness further testified that the merchandise at bar was manufactured by Sociedad Agricola Paramonga, Limitada, a wholly owned subsidiary of W. R. Grace & Co., and that he was thoroughly familiar with the processes of manufacture. He identified three samples of

the paper, which were received in evidence as plaintiffs' collective exhibit 1, and a jar containing some shredded sugarcane stalk, introduced into evidence as plaintiffs' illustrative exhibit 2. After expressing his familiarity with the term "strawboard" and the uses of that commodity, Cook stated that strawboard or straw paper is made from pulp produced by chemical treatment of straw; that it is coarse, rigid, hard, brown in color, and does not take a high finish. He was of opinion that plaintiffs' collective exhibit 1 is strawboard; and that plaintiff's collective exhibit 1 in the case of *Harold A. Sothern* v. *United States* (32 Cust. Ct. 216, C. D. 1605), received in evidence here as plaintiffs' collective illustrative exhibit 3, was also strawboard, but admitted that visual inspection would not reveal what kind of strawboard it is. He also produced samples of strawboard, manufactured by Hinde & Dauch, Weston, and Trenton, which were received in evidence as plaintiffs' illustrative exhibits 4–A, 4–B, and 4–C, respectively. Concerning these, he stated that they compare very closely with plaintiffs' collective exhibit 1 in both quality and appearance. He saw in them, as he did in the other exhibits, flecks or pieces of straw.

On cross-examination, Cook testified that, in processing the merchandise at bar, both the pith and the stalk of the bagasse are used. In response to questioning by the court, he replied that sugarcane is of the grass (*graminae*) family, of the specie *Saccharinum*, and that straw generally consists of wastes from the grass family, from which some agricultural product has been removed. He further stated that the subject merchandise is used as a corrugating medium in the manufacture of corrugated boxes; in heavier weights, it is used as book backs and binders' board.

Strawboard, according to this witness, has been made for many years, but the use of bagasse in its manufacture by his company dates back to 1937. In this connection, he said:

This type of paper that you see before you belongs to the class known for many years as strawboard in this country and made from straws that are available in this country, but bagasse has only been used in our case in our instance from 1937.

The defendant called as its witness Donald J. MacLaurin, who has been, since 1955, technical director of the Gilbert Paper Co., a manufacturer of fine papers. His educational background includes a bachelor of applied science degree in chemical engineering from the University of British Columbia; a year's graduate work at the University of Washington; a master of science degree from the Institute of Paper Chemistry; some graduate study toward a doctor's degree in wood chemistry; and certain teaching experience at the Institute of Paper Chemistry; all of which was directed toward the paper and pulp industry.

From 1928 to 1935, he was with the British Columbia Pulp & Paper Co., Ltd., a firm engaged in the manufacture of pulp for papermaking

and for making rayons and associated synthetic fibers, his work being "operating technical and management." From 1937 to 1946, except for the war years, this witness was employed as technician by the Kimberly Clark Corp., a multimill corporation engaged in the manufacture of many kinds of paper and paperboards. He then became technical director of the Powell River Co., Ltd., manufacturer of newsprint. From 1950 to 1955, he served as chief of the pulp and papermaking section of the Institute of Paper Chemistry, a private, nonprofit organization which has a threefold aim, to wit:

* * * to provide research facilities for the American Pulp and Paper Industry; to provide the academic facilities where scientists may be trained for the American Pulp and Paper Industry and to assemble, maintain and disseminate the technical literature suitable to the American Paper and Pulp Industry.

It was during his association with the Institute of Paper Chemistry that the witness became familiar with bagasse, and paper products made from straw. It was his duty to visit mills making these products from straw to discuss their technical and economic problems. According to this witness, although strawboard is a coarse board, there are other coarse boards which are not strawboards, such as bogus board, chestnut board, semichemical board, and kraft board.

So far as MacLaurin was aware, the three samples, comprising plaintiffs' illustrative exhibits 4–A, 4–B, and 4–C, were strawboard, which he defined as a board made from straw. The witness defined straw as "one of the products of threshing cereal grains; it is the dry, mature, stems of cereal grains," and bagasse as "the crushed stalks of sugar cane after the juice has been removed by an extrusion." As it was his opinion that bagasse is not straw, he believed that plaintiffs' collective exhibit 1 was not made from straw, and is not, therefore, strawboard. In distinguishing between bagasse and straw, MacLaurin pointed out that bagasse is a stalk an inch or an inch and a half in diameter, 6 or 8 feet tall, whereas straw is a small stem, an eighth to a quarter of an inch in diameter, a foot to 18 inches long; straw is generally golden brown in color; bagasse, a drab gray. Moreover, bagasse, as represented by plaintiffs' illustrative exhibit 2, contains pith, which is not present in straw.

This witness further stated that he had never heard any one in the paper industry refer to a paper or board made from bagasse as strawboard, or to bagasse as straw, nor does he regard board made from lemon grass or citronella grass as strawboard.

On cross-examination, MacLaurin testified that the term "strawboard" does not define a physical state; that it means board made from straw; and that you could not tell by looking at a piece of board from what it is made. He admitted that he had never purchased strawboard in commercial quantities; neither had he manufactured or sold it; and that his experience in the paper and pulp industry had

been principally on the technical side. Nevertheless, he asserted that the definitions which he used were those current in the paper and pulp industry, and that, within that industry, straw means the stalks of cereal grain, with the possible addition of flax stalks; strawboard means the board made from cereal grain straw.

It thus appears that both witnesses who testified in this action are in agreement over the proposition that strawboard and straw paper are made from pulp produced by the chemical treatment of straw. Although neither witness had any selling experience with this class of merchandise, both may be characterized as technical experts, well qualified to discourse upon the nature and characteristics of the commodity in question, in aid of the court's understanding of the meaning of those terms. *Roche-Organon, Inc.* v. *United States*, 35 C. C. P. A. (Customs) 99, C. A. D. 378; *Brier Manufacturing Co.* v. *United States*, 39 C. C. P. A. (Customs) 68, C. A. D. 465. Moreover, their definitions of strawboard and straw paper as a product of straw is substantiated by prevailing authority. Webster's New International Dictionary, and Funk & Wagnalls New Standard Dictionary both so define it.

The Dictionary of Paper, published by the American Paper and Pulp Association of New York, 1951 edition, states:

STRAWBOARD.—(1) A paperboard used for setup boxes, tablet backs, etc. It is a rigid board but not susceptible to high finish and for the setup box trade is usually lined with paper. (2) A paperboard used for mailing tubes and cans. The board is made about 0.020 of an inch in thickness for spiral winding and is resistant to crushing. (3) Corrugating material in the manufacture of shipping containers. The strawboard is 0.009 of an inch in thickness and is readily formed into flutes in the corrugating process. When it is pasted with a liner on one or both sides, it is rigid and resilient after compression. Strawboard is made from straw which is treated chemically and then passed through the customary paper-making process. * * *

Strawboard and straw paper were first *eo nomine* provided for in the trade agreement with the Netherlands, 69 Treas. Dec. 10, T. D. 48075. In a publication entitled "Concessions Granted by the United States in the Trade Agreement With the Kingdom of the Netherlands," issued by the United States Tariff Commission at the time of the negotiation of said trade agreement, this commodity and its uses are described as follows:

Strawboard is a cheap, coarse, unbleached-pulp product made on a multi-cylinder machine from the straw of rice, wheat, rye, or other grains. It is used in the making of a large number of products such as containers or boxes, mailing tubes, egg case fillers, cheap book bindings, tablet backs, and similar articles. The thinner boards are usually corrugated and then used as centers for container board. Noncorrugated strawboard is made in several finishes, and in the heavier weights it is often a pasted board made up of several layers of thinner board. The strength of strawboard is not ordinarily equal to that of chip or newsboard in

the manufacture of boxes, and for use in some types of containers it must be lined because of its color.

Further explanation of the provisions for strawboard and straw paper in paragraphs 1402 and 1409 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, *supra*, may be found in the Tariff Commission's publication entitled "Trade Agreement Digests," volume XIV, "Papers and Books," issued for use in connection with trade agreement negotiations in November 1946. It is there stated:

Strawboard is a coarse board made of pulp produced by the chemical and mechanical treatment of straw from wheat, rye, barley, oats, or other plants. It is rigid, hard, usually yellow or brown in color, can be made on any type of paper machine, and will not take a high finish. It may range in thickness from 6 to 90 one-thousandths of one inch, the thicker boards often being lined with book or other paper before final use.

In the case of *Harold A. Sothern* v. *United States, supra*, this court was called upon to determine the meaning of the term "strawboard" with reference to an importation of paper board made from dried stalks of citronella and lemon grasses, chemically treated and processed. We held said merchandise to be strawboard for the following reasons:

Especially in view of the admission of defendant's witness, Moore, that dried grass could be used in making strawboard, and that there are so-called strawboards which are made without straw, it would be taking an extremely narrow interpretation of the cited definitions to hold that strawboard is such paperboard only whose principal ingredient is dried cereal grass. It places no undue strain upon these definitions to adopt the more comprehensive view that dried stalks of grasses other than grains are likewise generally, commonly, and popularly known as straw, and that paperboard made from nongrain grasses, which have been dried and chemically treated, is strawboard. Since the evidence in this case clearly shows that the merchandise at bar was made from dried stalks of citronella and lemon grass, chemically treated and processed, we have no hesitation in holding that it is strawboard within the common understanding of that term.

In view of our discussion of the meaning of the term "straw" in the cited case, it is apparent that our conclusion rested upon a finding that the dried grasses used to produce the paper then before us were straw and that we found a meaning for the term "strawboard" ["straw paper"] consistent with the definitions to which we have hereinabove adverted.

Strawboard, being a product of pulp made from straw, the issue here is, in the last analysis, whether bagasse, from which the merchandise at bar is admittedly made, is straw. Counsel for plaintiffs urges that, since the common meaning of the term "straw" has been judicially held to include some stalks of nongrain grasses (*Harold A. Sothern* v. *United States, supra*), crushed stalks of sugarcane from which the juices have been extracted are likewise straw.

We do not construe our decision in the cited case as a holding that the dried stalks of all other grasses are, in fact, straw. Clearly, there are grasses which would not respond to the designation, "straw," as, for example, the so-called galingale rush, cut from a tall grass or plant grown in China, which was held not to be straw in the case of *Kwong Yuen Hing Company* v. *United States*, 6 Treas. Dec. 288, T. D. 24330.

As pointed out by the witness for the defendant, there are distinct morphological and chemical differences between bagasse and straw. These two articles differ in the height and thickness of the stalk, in color, in pith content, in the bands or spreads of their components, and in silica content. In papermaking, straw and bagasse have always been regarded as different materials. They are separately enumerated and defined in the Dictionary of Paper; in a volume entitled "Raw Materials for More Paper," wherein are reported the findings of the Food and Agriculture Organization of the United Nations at a conference in Rome, Italy, in April 1953; in a publication of McGraw Hill Book Co., known as "Pulp and Paper Manufacture," prepared under the direction of the Joint Executive Committee of the Vocational Education Committees of the Paper and Pulp Industry, which witness MacLaurin termed "almost the Bible in our industry"; and in "Chemistry of Pulp and Paper Making," by Edwin Sutermeister.

In the case of *Masonite Corporation* v. *Celotex Co. et al.*, 66 F. 2d 451, the Circuit Court of Appeals for the Third Circuit, in construing a disclaimer of straw as a potential patent-infringing ingredient, held it not to include bagasse. It was there stated:

* * * But for convenience, taking the disclaimer as the trial court construed it, as disavowing the use of straw, it is plain that all it disclaimed was straw. It disclaimed nothing else. Bagasse is something else. Clearly it is not straw. In this case we are concerned with bagasse, not with straw, as an infringing ingredient.

Because of its woody character, and of the presence of cellulose, lignins, and pentosans of the same types, though in different proportions, than found in trees, the court held that bagasse fell within the claims of the patent for "woody material" as a fiber source, and that certain hardboard manufactured from bagasse fibers infringed upon plaintiff's patent.

We are in agreement with the conclusion that bagasse is not straw, and, therefore, necessarily hold that the merchandise here involved is not strawboard or straw paper. All claims in the protests are consequently overruled.

Judgment will be entered accordingly.